**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICK HENRY O'REILLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 1409** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patrick Henry O'Reilly seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Defendant's motion and denies Plaintiff's motion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on January 12, 2007, alleging that he became disabled on October 15, 2006 from three left hip replacement surgeries. (R. 135, 140). The Social Security Administration ("SSA") denied the application initially on March 28, 2007, and again on reconsideration on May 24, 2007. (R. 74-78, 81-84). Plaintiff filed a timely request for a hearing and appeared before Administrative Law Judge Joseph P. Donovan, Sr. (the "ALJ") on October 15, 2008. The ALJ heard testimony from Plaintiff, who was accompanied by a non-attorney representative, as well as from medical expert Ashok G.

Jilhewar (the "ME") and vocational expert Pamela Tucker (the "VE"). Shortly thereafter, on March 25, 2009, the ALJ found that Plaintiff was disabled during the closed period of October 15, 2006 through August 27, 2008. The ALJ further determined that as of August 28, 2008, Plaintiff's condition medically improved to the point where he is now capable of performing a significant number of light, unskilled jobs available in the regional economy. (R. 57-67). The Appeals Council denied Plaintiff's request for review on January 28, 2011, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 1-3).

In support of his request for reversal or remand, Plaintiff argues that the ALJ (1) erred in finding medical improvement as of August 28, 2008; (2) improperly discounted his complaints of pain; (3) made a flawed RFC determination; and (4) erred in failing to order a consultative examination. As discussed below, the Court finds no merit to any of these challenges.

## FACTUAL BACKGROUND

Plaintiff was born on January 6, 1959, and was 50 years old at the time of the ALJ's decision. (R. 17, 135). He has a GED plus additional training as a welder, and his past work includes pipefitter and truck driver. (R. 17, 144). Plaintiff stopped working on October 15, 2006 due to pain and discomfort in his left hip. (R. 140).

### A. Medical History

The record does not contain any medical treatment notes prior to February 2007, but it appears that Plaintiff had a left bipolar hip replacement in 1982, followed by a revision in 1984. Dr. Aaron G. Rosenberg of Midwest Orthopaedics performed a second revision in or around 1990. (R. 173, 195, 206). Plaintiff also had a right wrist fusion in 1997 at St.

2

Luke's Presbyterian. (R. 174). At some point after October 15, 2006, Plaintiff started seeing Dr. Rosenberg again due to a recurrence of his hip pain, but there are no records reflecting those visits.

In response to Plaintiff's January 12, 2007 application for benefits, Afiz Taiwo, M.D., completed an Internal Consultative Examination of Plaintiff for the Bureau of Disability Determination Services ("DDS") on February 24, 2007. (R. 173-76). Plaintiff complained of constant, aching pain at a level of 7 out of 10 in his left hip, which became intermittent and sharp with walking. (R. 173). He told Dr. Taiwo that he could walk for one block, stand for 20 minutes, and sit for half an hour, but he reported having difficulty bending, vacuuming, and standing for prolonged periods of time. (R. 174). On examination, Dr. Taiwo found that Plaintiff's left leg was longer than his right by two inches such that he walked with a slight limp. He also exhibited reduced range of motion in his left hip, with flexion of 60 degrees (normal being 125 degrees) and abduction of 30 degrees (normal being 45 degrees). (R. 175). At the same time, Plaintiff's gait was "non-antalgic," he could walk more than 50 feet without any assistive devices, he had no trouble getting on and off the exam table, there was no palpable tenderness in his hip, and his straight leg raise and Romberg[1] tests were both negative. Dr. Taiwo diagnosed left hip pain and a history of multiple left hip replacements. (*Id.*).

The following month, on March 19, 2007, Ernst Bone, M.D., performed a Physical Residual Functional Capacity Assessment ("PRFC") of Plaintiff for DDS. (R. 178-85). Dr.

---

[1]     A "Romberg test" is "[a] clinical test used to evaluate dysequilibrium." (http://medical-dictionary.thefreedictionary.com/Romberg's+test, last viewed on March 13, 2012).

Bone concluded that Plaintiff could: occasionally lift 20 pounds; frequently lift 10 pounds; sit, stand and/or walk for about 6 hours in an 8-hour workday; push and/or pull without limitation; occasionally climb ramps, stairs, ladders, ropes and scaffolds; and frequently balance, stoop, kneel, crouch and crawl. (R. 179-80). In support of this assessment, Dr. Bone noted that Plaintiff could walk without an assistive device, had negative Romberg and straight leg raise tests, exhibited flexion of 60 degrees and abduction of 30 degrees in his left hip, had full range of motion in all other joints, and had motor strength of 5 out of 5. Dr. Bone concluded that Plaintiff "appears capable of performing the level of work activity described in this form." (R. 185).

### 1.     Back Treatment in 2007

On April 2, 2007, Plaintiff had a bone scan at the Riverside Medical Center. The scan showed abnormal findings in the left hip and lumbar spine, and Dr. Rosenberg referred Plaintiff to Midwest Orthopaedics' Spine and Back Center to determine whether there was "lumbar contribution to his pain." (R. 190, 195). April Fetzer, D.O., of the Spine and Back Center examined Plaintiff on April 19, 2007. His lumbar spine was flat with "significantly decreased curvature," and he experienced pain on extension and on "facet-loading maneuvers." (R. 195). Dr. Fetzer assessed "[a]xial low back pain, likely facet mediated, with possible bilateral radicular symptoms versus spinal stenosis." (R. 196). She recommended physical therapy and ordered an MRI and lumbar X-rays "to evaluate nerve root pathology." (Id.).

Later that same day Dr. Fetzer reviewed Plaintiff's bone scan and noted that it revealed "increased uptake at the left proximal femoral shaft likely suggestive of prosthesis loosening," as well as "increased uptake at L2 and L4 in the vertebral bodies." (R. 197).

4

She deferred the issue of prosthesis loosening to Dr. Rosenberg, and indicated that she would "further evaluate [Plaintiff's] lumbar areas" following his diagnostic testing. (*Id.*). In that regard, Plaintiff appeared for a scheduled MRI of the lower back on May 7, 2007. The test showed degenerative disc disease at L2-L3 with no significant protrusion, and conjoined nerve roots exiting on the right at L5-S1. (R. 188). Approximately two weeks later, on May 23, 2007, Francis Vincent, M.D., affirmed Dr. Bone's assessment that Plaintiff had the capacity to do light work. (R. 191-93).

At a follow-up visit with Dr. Fetzer on May 29, 2007, Plaintiff reported that he had not started physical therapy due to "monetary issues." He continued to complain of axial low back pain bilaterally "with characteristics of numbness, tingling and burning," but his gait remained non-antalgic and he had no motor or sensory deficits from L4 through S1 bilaterally. (R. 200). Dr. Fetzer discussed the MRI results with Plaintiff, explaining that the test revealed "mild degenerative disk change at L2-3," and "some mild lumbosacral spondylosis[2] [at] L4-5 and L5-S1 with bilateral foraminal narrowing, mild at L5 bilaterally." There was no evidence of central canal or lateral recess stenosis, or nerve root impingement. (*Id.*).

Dr. Fetzer diagnosed "[a]xial low back pain likely facet mediated but also from weak core musculature." She opined that Plaintiff "may have a component of bilateral L5 radiculitis," and indicated that the "first approach" for treatment was still physical therapy. Plaintiff "seem[ed] somewhat resistant" to this idea but accepted a prescription for a

---

[2]     "Spondylosis" refers to "degeneration of the spine." (http://www.spine-health.com/conditions/back-pain/spondylosis-what-it-actually-means, last viewed on March 26, 2012).

therapy program. Plaintiff was also not interested in the next level of intervention, including a diagnostic intraarticular facet injection and selective nerve root block. Dr. Fetzer told Plaintiff that she "d[id] not feel he is disabled regarding his lumbar spine," and instructed him to follow up in six weeks for reassessment. (*Id.*).

### 2. 2008 Hip Surgery

Pursuant to a referral from Dr. Rosenberg, Plaintiff saw Dr. Scott Sporer at Central DuPage Hospital on February 22, 2008. Dr. Sporer reviewed Plaintiff's X-rays and noted a "monoblock fibrous coated AML [anatomical medullary locking] stem" and an apparent "HG-II component which shows a circumferential radiolucency." (R. 206, 216). Dr. Sporer assessed "[l]eft hip aseptic acetabular loosening" and recommended that Plaintiff have a left acetabular revision. (R. 206). At a preoperative evaluation on March 21, 2008, Plaintiff stated that he was "markedly debilitated" by his hip pain and wanted to proceed with surgery. (R. 205).

Dr. Sporer performed the acetabular revision on May 8, 2008. (R. 208-10, 214). At a follow-up visit on May 23, 2008, Plaintiff was "doing well" with "no complaints." X-rays showed the "AML stem in good position" with "[c]omponents . . . well fixed." (R. 204, 213). When Plaintiff returned to Dr. Sporer on June 25, 2008, he was still doing well and healing nicely. He reported being "very happy with his surgical result," and was "working hard" on physical therapy. (R. 203). On examination of the left hip, Plaintiff had full extension, flexion to 100 degrees, internal rotation to 15 degrees, and external rotation to 35 degrees with no pain. An X-ray again showed the AML stem to be in good position and "well fixed." (R. 203, 212).

Plaintiff next saw Dr. Sporer on August 27, 2008. He complained of some intermittent pain and discomfort, but said that it was "improving with his strength training." (R. 202). Plaintiff's range of motion remained steady from his previous visit, and an X-ray was unchanged as well. (R. 202, 211). Dr. Sporer instructed Plaintiff to return for a follow-up evaluation in three months. (R. 202).

The next and final medical record is dated October 7, 2008, at which time Plaintiff saw Steven Decker, D.O., at the Riverside Medical Center due to a "painful hip injury." (R. 218). The treatment note indicates that Plaintiff was taking Tramadol every 6 to 8 hours, as well as aspirin and Lorazepam (a sleep aid). Dr. Decker told Plaintiff to see his primary care physician if his symptoms worsened. (*Id.*).

## B.    Plaintiff's Testimony

At the October 15, 2008 hearing before the ALJ, Plaintiff testified that he can sit for 20 to 25 minutes at a time, stand for about half an hour, walk 100 to 150 feet, lift 20 to 25 pounds, carry 10 to 15 pounds, and push and/or pull 20 to 25 pounds. He has trouble bending, crouching and crawling, but he is able to reach and use his hands. (R. 24-28). Plaintiff stated that he initially took Vicodin for pain after his surgery, but the doctor switched him to Tramadol and aspirin as of August 27, 2008. (R. 46-48). He indicated that both the Vicodin and the Tramadol make him light-headed, but he was able to pay attention in the hearing. (R. 29, 47). Plaintiff described his most recent visit to the Riverside Medical Center emergency room on October 7 as a "precaution" because he was "pretty stiff in the morning." He confirmed that an X-ray of his hip taken at that time showed that "[e]verything looked in place." (R. 44-45).

### C.     Medical Expert Testimony

Dr. Jilhewar testified at the hearing as an ME.  He opined that from April 2007 through August 27, 2008, Plaintiff's hip impairment met Listing 1.02A for major joint dysfunction and rendered him disabled during that closed period.  (R. 34-35).  Plaintiff's "chronic low-back pain of 20 years" did not meet or equal any listing.  (R. 34).  In response to questioning from the ALJ, the ME acknowledged that Plaintiff alleged a disability onset date of October 15, 2006, and indicated that the hip prosthesis loosening reflected in the April 2007 bone scan may not have had "an immediate onset."  The ME explained, however, that he relied on the available medical documentation, which did not include any information prior to April 2007.  (R. 32, 35).

With respect to the disability end date, the ME noted that Plaintiff was doing well three months after his surgery, and opined that beginning August 28, 2008, he was capable of engaging in light work in accordance with Dr. Bone's March 2007 PRFC, as affirmed by Dr. Vincent in May 2007.  (R. 35, 39).  The ME stated that Plaintiff's visit to the Riverside Medical Center in October 2008 did not change his opinion because Plaintiff did not require hospitalization.  (R. 43-44).  The ME also testified that he does not consider pain to be an impairment, and noted that there was no medical diagnosis of severe pain or evidence that Plaintiff was taking prescription narcotics.  (R. 45-46).

### D.     Vocational Expert Testimony

Pamela Tucker testified at the hearing as a VE.  She characterized Plaintiff's pipefitting work as heavy and skilled, and stated that his truck driving job was medium and semi-skilled.  (R. 31).  The ALJ asked the VE to consider a hypothetical person of Plaintiff's age who can:  occasionally lift 25 pounds; frequently lift 10 pounds; stand and walk for 2

hours out of an 8-hour workday; sit for 6 hours out of an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolding; occasionally balance, stoop, and kneel; and never crouch or crawl. The person would also need a sit-stand option, and could not be around concentrated exposure to humidity, vibration, unprotected heights, or hazardous moving machinery. (R. 40-41).

The VE testified that such a person could not perform any of Plaintiff's past jobs, but could work as an assembler (approximately 4,200 positions), a light packer (approximately 7,000 positions), or a ticket seller (approximately 3,200 positions). (R. 41-42). If the individual needed to use a cane, then the number of available light packer jobs would be reduced to approximately 5,000. (R. 42).

### E.    The ALJ's Decision

The ALJ found that Plaintiff has four severe impairments, including (1) "left hip replaced acetabulum"; (2) "chronic low back pain for 20 years without motor or sensory changes"; (3) "status post loosening of the acetabulum"; and (4) "status post replacement of the left hip prosthesis." (R. 60). The ALJ accepted the ME's opinion that Plaintiff's left hip aseptic acetabular loosening and subsequent left hip revision surgery met Listing 1.02A and rendered him disabled for a closed period of time ending August 27, 2008. Though Plaintiff failed to produce any medical records prior to April 2007, the ALJ credited his testimony that he was under Dr. Rosenberg's care in 2006, and that the disability began on October 15 of that year. (R. 61, 62). As the ALJ explained, the prosthesis loosening shown on the bone scan "did not just occur on April 2, 2007 but was substantiated as of that date." (R. 62).

With respect to the period after August 27, 2008, the ALJ found that Plaintiff's disability ended due to medical improvement. In reaching this conclusion, the ALJ relied on the ME's testimony that three months after the surgery, Plaintiff was doing well with only intermittent pain and discomfort that was improving with strength training. (R. 62-63). In addition, Plaintiff had full extension, flexion of 100 degrees, internal rotation of 15 degrees, and external rotation of 35 degrees in his left hip with no pain. The ALJ stressed that he kept the record open after the hearing to allow Plaintiff to submit more current medical documentation, but Plaintiff produced only a single discharge summary from Riverside Medical Center dated October 7, 2008. Plaintiff acknowledged that he went to the emergency room on that date solely "for precaution," and an X-ray showed no problems with his left hip. (R. 63).

The ALJ next determined that as of August 28, 2008, Plaintiff has the residual functional capacity ("RFC") to perform light work with occasional balancing, stooping, kneeling, and climbing of ramps and stairs, as long as he can sit and stand at will, never has to crouch, crawl, or climb ladders, ropes, or scaffolds, and can avoid concentrated exposure to unprotected heights, hazardous moving machinery, vibration, and humidity. (*Id.*). The ALJ explained that this RFC is consistent with the opinions of State agency consultants Dr. Bone and Dr. Vincent, as well as the ME. (R. 64). The ALJ also observed that the RFC is supported by the medical evidence. For example, Plaintiff's hip condition improved following surgery, he had only intermittent pain that was improving with physical therapy, and the October 2008 X-ray showed that "everything was fine with the left hip and prosthesis." (*Id.*). According to Dr. Fetzer's treatment records, moreover, Plaintiff's back condition was not disabling despite evidence of mild degenerative disc disease at L2-L3,

mild lumbosacral spondylosis at L4-L5 and L5-S1, and mild bilateral foraminal narrowing at L5.  (*Id.*).

In the ALJ's view, Plaintiff's own testimony provided further support for the RFC in that he admitted to being able to lift 20 pounds, carry 10 pounds, and stand for 30 minutes, which is consistent with light work.  (R. 65).  As for Plaintiff's assertion that his medications make him light-headed, the ALJ noted that there is no evidence that he ever complained of such a side-effect.  Plaintiff did state in his "Disability Report - Appeal" that he has difficulty caring for his personal needs, but he said nothing at the hearing to indicate that he was "impeded in the performance of his activities of daily living subsequent to August 28, 2008."  (R. 65, 163).

Based on the stated RFC, the ALJ agreed with the VE that Plaintiff cannot perform any of his past relevant work, but that there are 4,200 assembler jobs, 7,000 light packer jobs, and 3,200 ticket seller jobs that fall within his RFC.  As a result, the ALJ found that Plaintiff's disability ended on August 28, 2008.  (R. 66).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."  *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial

evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

## B.     Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. 42 U.S.C. § 423(d); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford*, 633 F. Supp. 2d at 630. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to

perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff argues that the ALJ's decision must be reversed because he (1) erred in finding medical improvement as of August 28, 2008; (2) improperly discounted Plaintiff's complaints of pain; (3) made a flawed RFC determination; and (4) erred in failing to order a consultative examination. The Court considers each argument in turn.

### 1.    Medical Improvement

Plaintiff first challenges the ALJ's finding that he experienced medical improvement as of August 28, 2008 and is now capable of performing light work. Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A finding of decreased medical severity must be based on "changes in the symptoms, signs or test results associated with [the claimant's] impairment(s)." *Id.*; *Tumminaro v. Astrue*, __ F.3d __, 2011 WL 5301607, at *3 (7th Cir. 2011). When, as here, the ALJ finds the claimant disabled for a closed period in the same decision in which he finds medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date. *Koslow ex rel. Koslow v. Astrue*, No. 2:08-CV-159-PRC, 2009 WL 1457003, at *11 (N.D. Ind. May 22, 2009).

To determine whether medical improvement has occurred, the ALJ engages in an eight-step inquiry: (1) Is the claimant engaged in substantial gainful activity?; (2) If not, does the claimant have an impairment or combination of impairments which meets or

equals the severity of a listed impairment?; (3) If not, has there been a medical improvement?; (4) Is the medical improvement related to the claimant's ability to do work?; (5) Do any exceptions to medical improvement apply? (6) Are the claimant's current impairments severe in combination?; (7) If so, can the claimant perform his past relevant work?; (8) If not, can the claimant do other work given his residual functional capacity, age, education and work experience?  20 C.F.R. § 404.1594(f); *Vogel v. Astrue*, No. 4:10-CV-20-WGH-RLY, 2011 WL 304825, at *4-5 (S.D. Ind. Jan. 25, 2011).

### a.    Step Two

Plaintiff takes issue with the fact that at step two, the ALJ did not discuss Listings 1.03 (reconstructive surgery of a major weight-bearing joint) and 1.04 (disorders of the spine), even though his non-attorney claims representative mentioned both at the October 2008 hearing.  (Doc. 18, at 8).  There is no dispute that Plaintiff "must satisfy all of the criteria in [a] Listing in order to receive an award of disability insurance benefits." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).  Here, Plaintiff does not discuss any of the relevant criteria, much less explain how his impairments satisfy them.

Listing 1.03 requires "ineffective ambulation," which is "'defined generally' as requiring the use of a hand-held assistive device that limits the functioning of both upper extremities." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03).  Other examples of ineffective ambulation include "the inability to walk without the use of a walker or two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to carry out routine ambulatory activities, like shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single handrail." *Id.* Listing 1.04 refers to "[d]isorders

14

of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fractures), resulting in compromise of a nerve root . . . or the spinal cord," with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04; *McDonald v. Astrue*, No. 10 C 4910, 2012 WL 832804, at *9 (N.D. Ill. Mar. 12, 2012).

The available medical records show that even before his May 2008 hip revision, Plaintiff was able to walk more than 50 feet without any assistive devices, and he had a non-antalgic gait. (R. 175). By the time of the October 2008 hearing, Plaintiff was able to walk 100 to 150 feet, with at most a single cane. (R. 25). In short, there is no evidence that Plaintiff ever suffered from ineffective ambulation as required by Listing 1.03. With respect to Listing 1.04, Plaintiff states only that he "had chronic low back pain for 20 years." (Doc. 18, at 9). This in no way establishes that he has a Listing-level spinal disorder. The May 2007 MRI showed "mild degenerative disk change at L2-3," and "some mild lumbosacral spondylosis [at] L4-5 and L5-S1 with bilateral foraminal narrowing, mild at L5 bilaterally." Based on these results, Dr. Fetzer opined that Plaintiff is not disabled by a spinal impairment. (R. 200). Plaintiff points to no additional medical documents suggesting that he has nerve root compression or any other condition described in Listing 1.04. *See Cain v. Astrue*, No. 10 C 6849, 2011 WL 6734508, at *6 (N.D. Ill. Dec. 21, 2011) ("[T]he claimant bears the burden of proving his impairment meets a listing."). On this record, the ALJ did not err in failing to discuss Listings 1.03 and 1.04, and Plaintiff's objection on that ground is without merit.

15

### b.    Step Three

Plaintiff next argues that at step three of the analysis, the ALJ improperly relied on the ME's speculation that he medically improved following surgery.  (Doc. 18, at 7-8).  In Plaintiff's view, the ME merely assumed that most people improve in three months' time without considering "whether in fact [Plaintiff] is better."  (*Id.*).  Plaintiff does not cite to a specific portion of the ME's testimony, and the Court finds nothing speculative about his opinion.  The medical evidence shows that Dr. Sporer described Plaintiff as "doing well" in May, June and August 2008, and that X-rays on all three occasions confirmed that his AML stem was in good position and well fixed.  (R. 202-04, 211-13).  Plaintiff reported that he was "very happy" with his surgical result, and though he was experiencing some intermittent pain and discomfort in August 2008, it was improving with strength training.  (R. 202).  Consistent with these findings, the ME testified that Plaintiff was "doing well" and no longer met Listing 1.02A after August 27, 2008.  (R. 35).  Plaintiff cites to no contrary opinion from any other physician.

Plaintiff attempts to minimize the extent of his recovery by noting that according to the website About.com, hip revisions like the one he had in May 2008 are more complicated than initial hip replacements.  (Doc. 18, at 8) (citing http://orthopedics.about.com/od/hipkneereplacement/a/revisionhip.htm).  Plaintiff also makes much of Dr. Sporer's preoperative discussion of the risks of hip revision surgery and the "lifelong restrictions that the patient would have to undertake in the care of the total hip replacement."  (*Id.* at 10; Doc. 27, at 1-2) (citing R. 205).

As a preliminary matter, there is no dispute that the internet citation was not in the record before the ALJ, and Plaintiff does not argue that it constitutes "new and material

16

evidence" under 42 U.S.C. § 405(g).  *See Simila*, 573 F.3d at 522 (quoting *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)) ("'New' evidence is that which is 'not in existence or available to the claimant at the time of the administrative proceeding.'"). Regardless, Dr. Sporer never stated that Plaintiff had any specific restrictions that would preclude him from performing gainful employment after the surgery.  As noted, Dr. Sporer determined that Plaintiff was doing well, had full range of motion on extension, had flexion to 100 degrees, and was seeing improvement in pain and discomfort with his strength training and conditioning.  Plaintiff has not cited to any medical records after August 27, 2008 suggesting that his condition had deteriorated, or that he was unable to engage in work-related activities.  By Plaintiff's own account, an October 2008 X-ray still showed that "[e]verything looked in place." (R. 44-45).  The mere fact that surgery is inherently risky does not demonstrate that Plaintiff remained disabled three months after his hip revision.

Again citing neither case law nor record evidence, Plaintiff claims that "[o]ne might believe that he and the doctors would want him to be careful" following a fourth revision. (Doc. 18, at 10).  Such unsupported speculation is wholly inadequate to overturn the ALJ's decision.  It is true that Plaintiff said he was still using a cane at the time of the October 15, 2008 hearing, but he no longer needed crutches or a walker, and he had been working hard on physical therapy for several months.  (R. 24, 203).  Though the ALJ left the record open after the hearing, Plaintiff failed to submit additional records from Dr. Sporer or any other physician suggesting that he needed to avoid work or had a disabling impairment.  *See David v. Barnhart*, 446 F. Supp. 2d 860, 871 (N.D. Ill. 2006) ("The claimant's burden of proof includes providing medical evidence to substantiate his assertion of disability.").

17

Also unavailing is Plaintiff's speculation that his medical improvement may have been temporary. (Doc. 18, at 10). The Social Security Regulations state that where an impairment is subject to temporary remission, the ALJ must consider "the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsenings." 20 C.F.R. § 404.1594(c)(3)(iv). Examples of impairments subject to temporary remission include: multiple sclerosis, rheumatoid arthritis, many mental impairments, epilepsy, and asthma. *See* SSA Program Operations Manual System, § DI 28010.115, available at http://secure.ssa.gov/apps10/poms.nsf/lnx/0428010115 (last viewed on March 20, 2012). Plaintiff has not cited any cases where a court has applied the concept of temporary remission to a hip revision. Nor has he submitted any medical evidence indicating that his physicians viewed his recovery from hip surgery as temporary. Indeed, Plaintiff's previous "remission" prior to the May 2008 surgery lasted some 18 years. (R. 206).

In sum, the Court finds no error in the ALJ's determination that Plaintiff medically improved as of August 28, 2008, and declines to reverse the ALJ's decision on that basis.

### 2. Complaints of Pain

Plaintiff argues that the case must nonetheless be remanded because the ALJ improperly ignored his complaints of pain. The Seventh Circuit has made clear that "[a]n ALJ must consider a claimant's subjective complaints of pain if the claimant has a medically determined impairment that could reasonably be expected to produce that pain." *Craft*, 539 F.3d at 678. If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or

18

psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007) (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529.

The evidence regarding Plaintiff's pain is minimal. In February 2007, Plaintiff told DDS consultant Dr. Taiwo that he had constant, aching pain at a level of seven out of 10 in his left hip, which became intermittent and sharp with walking. (R. 173). Shortly thereafter, on April 19, 2007, Plaintiff told Dr. Fetzer that he was experiencing "low back pain, equal bilaterally, with radiating pain through the bilateral posterior thigh area and through the left lower extremity, extending to the foot, with characteristics of numbness, tingling and burning." Plaintiff said the pain was worse with sitting, but he also described his "average pain" as "very low grade." Dr. Fetzer noted that Plaintiff was not doing physical therapy or routinely performing any home exercises despite exhibiting pain on extension and on "facet-loading maneuvers," and she diagnosed him with axial low back pain. (R. 195). On May 29, 2007, Plaintiff continued to complain of "bothersome" low back pain, which he rated at a level of 1 out of 10. He was still not doing physical therapy due to "monetary issues," and he declined Dr. Fetzer's suggestion of a diagnostic intraarticular facet injection or selective nerve root block. (R. 200). There is no evidence that Dr. Fetzer ever prescribed Plaintiff any narcotics or other pain relievers.

In March 2008, Plaintiff told Dr. Sporer that he was "markedly debilitated" by his hip pain and wanted to proceed with surgery. (R. 205). At post-operative visits on May 23 and June 25, 2008, however, Plaintiff was happy with the outcome of the surgery, had no complaints, and was working hard on physical therapy. (R. 203-04). Plaintiff did complain

19

of "some intermittent pain and discomfort" on August 27, 2008, but he also reported that it was improving with strength training. (R. 202). The only other medical record is from October 2008, when Plaintiff went to the Riverside Medical Center emergency room "for precaution" due to morning stiffness. (R. 44, 218).

Plaintiff does not explain how these records support his claim of severe, pain-related limitations. Instead, he takes issue with the ME's testimony that he does not consider pain to be an impairment, arguing that the statement "caus[ed] the ALJ to not consider[] pain as a symptom of an impairment." (Doc. 18, at 10, 11; R. 45). This is inaccurate. Notwithstanding the ME's testimony, the ALJ fully explored Plaintiff's complaints of pain as set forth in the medical and testimonial record. (R. 62-63, 64-65). The ALJ expressly noted that Plaintiff was taking pain medications after his surgery, and found him to be disabled throughout the time he was using Vicodin. As of the August 28, 2008 disability end date, however, Plaintiff had switched to non-narcotic Tramadol and aspirin. (R. 25, 47). Plaintiff gave no indication that his pain significantly interfered with his activities of daily living or prevented him from returning to work at that time.

Plaintiff raises some other ill-defined concerns about the ME's statements regarding pain, including that they reveal him to be both "not impartial" and lacking in a clear understanding of the Listings. (Doc. 18, at 11). Plaintiff further observes that in an unrelated case, another ALJ erred in adopting this ME's opinion regarding medical improvement because it was based not on medical findings "but rather on [a] lack of treatment." *Koslow ex rel. Koslow*, 2009 WL 1457003, at *13. As the court explained, the ME failed to consider that the plaintiff did not seek treatment because her treating physician

told her "there was nothing she could do but wait and see whether her symptoms would improve." *Id.*

This Court finds these objections either unfounded or irrelevant. It is clear that the ALJ in this case independently considered all of Plaintiff's impairments and limitations, including pain, and reasonably concluded that he was no longer disabled after August 27, 2008. As noted, Plaintiff points to no contrary evidence in the record.

### 3. RFC Determination

At the October 2008 hearing, the ALJ asked the ME about Plaintiff's RFC as of August 28, 2008. The ME stated that Plaintiff could do light work as set forth in Dr. Bone's March 2007 PRFC. (R. 39). Plaintiff objects that this is "totally confusing" because Dr. Bone evaluated him more than a year before his May 2008 hip revision. (Doc. 18, at 9). Defendant responds that Dr. Bone relied on the consultative examination from Dr. Taiwo, which showed that even at a time when Plaintiff was disabled, he could walk more than 50 feet without any assistive devices, stand for 20 minutes, sit for half an hour, and get on and off the exam table without difficulty. He also had a non-antalgic gait and negative Romberg and straight leg raise tests. (R. 175). Defendant maintains that the ME "reasonably cited the prior RFC as evidence of [Plaintiff's] current condition" given that after the surgery, his hip was in good position and well fixed, and he had full extension and flexion to 100 degrees without pain. (Doc. 26, at 6). Defendant also notes that there are no contrary RFC assessments in the record. (*Id.*).

The Court finds it somewhat troubling that the ALJ and the ME both relied on Dr. Bone's March 2007 RFC as support for Plaintiff's RFC after August 27, 2008. Indeed, the ALJ arguably rejected Dr. Bone's assessment by determining that Plaintiff was disabled

21

from October 2006 through August 27, 2008. Nevertheless, the ALJ also relied on Plaintiff's own testimony that as of the October 2008 hearing date, he was able to lift 20 pounds, carry 10 pounds, stand for 30 minutes, and sit for 20 to 25 minutes. (R. 24, 27, 65). Plaintiff stated that these restrictions came from Dr. Sporer, (R. 27), and the level of activity the doctor authorized is consistent with light work, even if he did not expressly release Plaintiff to return to active employment. *See* 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

Plaintiff acknowledges his lifting and carrying abilities, but claims that "[w]hat he cannot do is the sitting and standing necessary, six to eight hours per day five days per week." (Doc. 18, at 12). The ALJ accommodated Plaintiff's difficulties in that regard, however, by giving him a "sit/stand option at will." (R. 63). Plaintiff contends that such an option is not sufficient to enable him to work, noting the abnormal findings in his April 2007 bone scan and MRI. The Court has already discussed Plaintiff's hip surgery, which successfully repaired the prosthesis loosening reflected in the scan. As for Plaintiff's back, Dr. Fetzer unambiguously concluded that he does not have a disabling lumbar condition. The MRI showed only mild degenerative disc change at L2-L3, some mild lumbosacral spondylosis at L4-L5 and L5-S1, and mild bilateral foraminal narrowing at L5. There was no evidence of central canal or lateral recess stenosis or nerve root impingement, and Plaintiff had a non-antalgic gait with no motor or sensory deficits. Dr. Fetzer thus opined that Plaintiff should treat his back condition with nothing more than physical therapy. (R. 200).

Plaintiff objects that due to his loose hip prosthesis, "it would not have been practical to do physical therapy as it would have with certainty been extremely painful." (Doc. 18, at 12). Even assuming this is correct for the period prior to August 28, 2008, there is no evidence that Plaintiff was incapable of physical therapy after that date. To the contrary, Plaintiff was working hard on strength training and conditioning of his hip, and he points to no evidence suggesting that he was unable to include back exercises into his routine as ordered by Dr. Fetzer.

Plaintiff also contends that the ALJ improperly dismissed his allegations of light-headedness and problems with concentration. (Doc. 18, at 9). The Court disagrees. The ALJ acknowledged Plaintiff's testimony in that regard, but noted that he never complained to his physicians about such a side-effect. (R. 65). Plaintiff was able to concentrate at the hearing, he did not identify light-headedness as a symptom that impeded his activities of daily living, and no physician expressed concern about his ability to concentrate while taking his medication or otherwise. (R. 29, 65, 163). Notably, as of August 27, 2008, Plaintiff was no longer taking Vicodin but had switched to the non-narcotic Tramadol for pain relief. (R. 46-47). On these facts, the ALJ did not err in discounting Plaintiff's complaints of light-headedness.[3]

---

[3] The Court also rejects Plaintiff's cursory argument that the ALJ should have included light-headedness in the hypothetical question posed to the VE. (Doc. 18, at 9). It is well-established that a hypothetical question need only "set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." Eichstadt v. Astrue, 534 F.3d 663, 668 (7th Cir. 2008) (quoting Herron v. Shalala, 19 F.3d 329, 337 (7th Cir. 1994)). See also McDonald, 2012 WL 832804, at *13 ("An ALJ is not required to include a claimant's alleged limitations in his hypothetical to a VE if the alleged limitations are not found in the medical reports in the record.").

23

For all the reasons stated above, the ALJ's RFC determination is supported by substantial evidence, and Plaintiff's motion for summary judgment on this issue is denied.

### 3.    Updated Medical Opinion

In a related argument, Plaintiff insists that since the only PRFC in the record is from Dr. Bone in March 2007, the ALJ should have ordered a consultative examination to "give an updated opinion" on his RFC after August 27, 2008.  (Doc. 18, at 13).  In support of this position, Plaintiff cites *Muhammad ex rel. K.M. v. Astrue*, 585 F. Supp. 2d 1023 (N.D. Ill. 2008), where the ALJ relied on a State Agency consultant's opinion in finding that a child was not disabled.  Rather than adopting that opinion in its entirety, however, the ALJ "examined additional evidence that was not considered by the State Agency experts," and found that in one domain of functioning, the child actually had a "marked" as opposed to "less than marked" limitation.  *Id.* at 1030.  The ALJ then concluded that the child nonetheless was not disabled as stated by the State Agency consultant.  *Id.* at 1033.  In reversing this decision, the court held that the ALJ should have obtained an updated medical opinion covering the additional evidence, rather than evaluating it on his own.  *Id.* at 1033.  The court explained that since the ALJ relied on that evidence to conclude that the child had a "marked" limitation, it "could have led a medical expert to conclude differently" as well.  *Id.*

Unlike in *Muhammad*, the ALJ in this case did not evaluate any medical evidence on his own.  Rather, he heard testimony from a medical expert, who reviewed all of the relevant records and opined that as of August 28, 2008, Plaintiff was capable of performing light work.  As noted, this finding is consistent with the restrictions set forth by Dr. Sporer.  Plaintiff laments that "[t]here were many unsubmitted records" and "nothing in the file to

24

explain" why his non-attorney representative failed to submit them as promised. (Doc. 18, at 13 n.10). He does not identify those records, however, or explain how they would support his claim of disability. *See Kadelak v. Astrue*, 802 F. Supp. 2d 934, 943 (N.D. Ill. 2011) (an omission from the record is significant "when it is prejudicial, and Claimant must set forth specific facts that the ALJ did not consider to show prejudice."); *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (remand appropriate where pro se plaintiff submitted "a separate appendix of medical records . . . for the limited purpose of demonstrating prejudice," and the documents "support[ed] [his] theory that the ALJ likely would have found [him] disabled had he considered them.").

There is no dispute that the ALJ left the record open to receive additional documents, and instructed the representative to "send me a letter within a week and let me know if you have any problems getting these records." (R. 48). The fact that the representative never followed up with this issue may be a source of "aggravation" for Plaintiff's attorney, (Doc. 18, at 13 n.10), but it is not a basis for remanding the case.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 17] is denied, and Defendant's Cross-Motion for Summary Judgment [Doc. 25] is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: March 29, 2012

*Sheila Finnegan*

SHEILA FINNEGAN
United States Magistrate Judge